**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **LORETTA McGEE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00026 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Loretta McGee, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McGee protectively filed her applications for DIB and SSI on February 3, 2004, alleging disability as of February 1, 2003,[1] based on back, neck, right arm, right knee and right shoulder pain, pain in the fingers of the right hand and "nerves." (Record, ("R."), at 101-04, 110, 137, 598-600.) The claims were denied initially and upon reconsideration. (R. at 76-78, 81, 82-84, 602-04, 608-10.) McGee then requested a hearing before an administrative law judge, ("ALJ"). (R. at 85.) The ALJ held a hearing on April 3, 2006, at which McGee was represented by counsel. (R. at 36-73.)

By decision dated May 18, 2006, the ALJ denied McGee's claims. (R. at 14-22.) The ALJ found that McGee met the disability insured status requirements of the Act for DIB purposes through June 30, 2005.[2] (R. at 16.) The ALJ found that McGee had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 16.) The ALJ also found that the medical evidence established that McGee suffered from severe impairments, namely reversal of the normal lordotic curvature, asymmetry in the space between the odontoid and lateral facets of the C1 level of the

---

[1]McGee's onset date was amended at the hearing from January 25, 2002, to February 1, 2003. (R. at 39.)

[2]Thus, McGee must show disability on or prior to June 30, 2005, in order to be eligible for DIB benefits.

-2-

Case 2:07-cv-00026-JPJ   Document 26   Filed 10/06/08   Page 2 of 20   Pageid#: 71

spine, an S1 transitional vertebra and substance abuse, but he found that McGee did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ further found that, absent substance abuse, McGee had no more than mild restrictions on her activities of daily living, mild difficulties maintaining social functioning and mild difficulties maintaining concentration, persistence or pace. (R. at 16.) The ALJ found that McGee's allegations regarding the intensity, duration and limiting effects of her symptoms were not entirely credible. (R. at 17.) The ALJ found that McGee had the residual functional capacity to lift items weighing up to 45 pounds maximally and up to 25 pounds frequently, that she could sit and/or stand for eight hours in an eight-hour workday with normal positional changes and that her ability to reach above her head was limited by 50 percent, but that she had no limitation with regard to fine motor movement skills. (R. at 17.) Although the ALJ concluded that McGee could perform her past relevant work as a cashier, a computer technician and a supervisor, he, nonetheless, proceeded to find that, based on McGee's age, education, work history and residual functional capacity and the testimony of a vocational expert, jobs existed in significant numbers in the national economy that she could perform, including those of a hand packer, a sorter, an inspector, a cashier and a sales clerk, all at the light level of exertion. (R. at 21.) Therefore, the ALJ concluded that McGee was not disabled under the Act and was not eligible for DIB or SSI benefits. (R. at 21-22.) *See* 20 C.F.R. §§ 404.1520(f),(g), 416.920(f),(g) (2008).

After the ALJ issued his decision, McGee pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 5-7.) McGee then filed this action seeking review of the ALJ's unfavorable decision, which now

stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008). The case is before this court on McGee's motion for summary judgment filed March 18, 2008, and the Commissioner's motion for summary judgment filed April 18, 2008.

## *II. Facts and Analysis*[3]

McGee was born in 1971, (R. at 101), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education and past relevant work as a cashier, a computer technician and a supervisor on a military base. (R. at 111, 116.)

McGee testified that she was involved in a motor vehicle accident in January 2002, resulting in a broken vertebrae in her neck which had caused neck and shoulder pain since that time.[4] (R. at 43-44.) She stated that she was prescribed narcotic pain medication, to which she became addicted, and that she had participated in drug rehabilitation three times. (R. at 44.) McGee stated that she had been "clean" for about a year and a half at the time of the hearing. (R. at 44.) She stated that her pain was so bad that she "hardly ever sle[pt]." (R. at 45.) McGee, who is right-handed, testified that she had difficulty picking up objects weighing more than five pounds with her right arm because it "pull[ed] on [her] neck." (R. at 45.) She stated that she had difficulty buttoning clothing and brushing her hair. (R. at 45.)

---

[3]The relevant time period for the court's consideration of McGee's DIB claim is from February 1, 2003, through June 30, 2005.

[4]There is no medical evidence contained in the record supporting McGee's allegation that she suffered a broken neck.

-4-

McGee also testified that she had experienced anxiety and depression since becoming unable to work because she felt like a burden to her family. (R. at 45.) She also stated that her mother, with whom she was very close, passed away two years previously, which "sent [her] into another one of [her] wild stages." (R. at 46.) McGee testified that she experienced crying spells approximately every other day, which medication did not help. (R. at 46.) She stated that these crying spells forced her to leave work approximately twice monthly. (R. at 50.) McGee testified that her eight-year old daughter lived in Tucson, Arizona, but that she talked with her weekly. (R. at 46-47.) She testified that she experienced mood swings, stating that she had been arrested for "fighting." (R. at 47.) She stated that she stayed by herself a lot. (R. at 47.) McGee testified that she had lost approximately 15 pounds over the previous six months, weighing 101 pounds at the time of the hearing. (R. at 47.)

McGee testified that she did not like to ride in a car unless necessary. (R. at 48.) She stated that she attended church services twice weekly, but could not sit through an entire service. (R. at 48.) She further stated that she could not use a computer all day because her hand "ha[d] never been the same since [the] accident." (R. at 51.) McGee testified that she could place canned goods on a shelf "for a little while, but not too long." (R. at 51.)

Dr. Susan Bland, M.D., a medical expert, also was present and testified at McGee's hearing. (R. at 51-58.) Dr. Bland summarized the medical evidence contained in the record. (R. at 51-56.) She noted that McGee had made a lot of unsupported allegations to various health care providers. (R. at 56.) Dr. Bland further noted that drugs were a significant part of McGee's history and that this drug use was

concurrent with McGee's subjective allegations. (R. at 56.) Therefore, Dr. Bland concluded that it was difficult to determine what limitations McGee might have and which conditions had been documented. (R. at 56.) However, Dr. Bland noted that no examination had documented any radiculopathy in the upper or lower extremities. (R. at 56-57.)

Thomas Schacht, Psy.D., a psychological expert, also was present and testified at McGee's hearing. (R. at 58-70.) Schacht thoroughly summarized the evidence relating to McGee's mental impairments and her drug use. (R. at 58-70.) Based upon his review of the medical evidence, he opined that McGee had no work-related mental limitations, absent possible drug and alcohol abuse. (R. at 70.)

Donna Bardsley, a vocational expert, also was present and testified at McGee's hearing. (R. at 70-72.) Bardsley testified that an individual with the limitations set forth in Dr. Blackwell's July 2004 evaluation could perform the jobs of a hand packager, a sorter, an assembler, an inspector, a cashier and a sales clerk, all at the light level of exertion. (R. at 70-71.) When Bardsley was asked to consider the same individual, but who could only occasionally reach, she testified that such an individual could not perform any jobs. (R. at 71.) Bardsley also testified that an individual with the limitations testified to by McGee could not perform any jobs. (R. at 71.) Finally, Bardsley testified that an individual who could not continuously perform overhead reaching, and who also had moderate difficulties in maintaining concentration, persistence and pace, could perform no jobs. (R. at 71-72.)

In rendering his decision, the ALJ reviewed records from Dr. R. Michael

Moore, M.D.; Dr. Gary S. Williams, M.D.; Stacey B. Gipe, P.A.-C; Norton Community Hospital; Life Center of Galax; Bon Secours St. Mary's Hospital; Wise County Behavioral Health/Frontier Health; Dr. Kevin Blackwell, D.O.; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; and R.J. Milan Jr., Ph.D., a state agency psychologist.

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West

2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

McGee argues that the ALJ erred by finding that, absent substance abuse, she had no severe nonexertional limitations. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) McGee also argues that the ALJ erred in his physical residual functional capacity finding. (Plaintiff's Brief at 12-13.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),

-8-

416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

McGee first argues that the ALJ erred by finding that, absent substance abuse, she had no severe nonexertional impairments. (Plaintiff's Brief at 7-12.) For the following reasons, I recommend that the case be remanded for further consideration of McGee's nonexertional impairments. In 1996, congress amended the Social Security Act to provide that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. §§ 423(d)(2)(C), 1382c(a)(3)(J) (West 2003 & Supp. 2008). These amendments specified that they were to "apply to any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security ... on or after the date of the enactment of this Act." Pub. L. No. 104-21, § 105(a)(5)(A) (amending 42 U.S.C. § 405 notes, pertaining to DIB), 110 Stat. 847, 853-54. Moreover, 20 C.F.R. §§ 404.1535(a), 416.935(a), state as follows: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."

Thus, under the Commissioner's regulations, the ALJ must first conduct the five-step disability inquiry without considering the impact of alcoholism or drug addiction. If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits, and there would be no need to proceed with the analysis under 20 C.F.R. §§ 404.1535, 416.935. If the ALJ finds that

the claimant is disabled and there is "medical evidence of [his or her] drug addiction or alcoholism," then the ALJ should proceed under 20 C.F.R. §§ 404.1535, 416.935 to determine whether the claimant "would still [be found] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535, 416.935 (2008); *see Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001). In other words, if, and only if, an ALJ finds a claimant disabled under the five-step disability inquiry, should the ALJ evaluate whether the claimant still would be disabled if he or she stopped using drugs or alcohol. *See Bustamante*, 262 F.3d at 955; *Drapeau,* 255 F.3d at 1214-15.

In this case, the ALJ should first have determined whether McGee's mental impairments were disabling under the five-step disability inquiry. *See McGhee v. Barnhart*, 366 F. Supp. 2d 379, 389 (W.D. Va. 2005). Should the ALJ have found McGee's mental impairments disabling, then, and only then, should he have proceeded to determine what effect her substance abuse had on that finding of disability. *See McGhee*, 366 F. Supp. 2d at 389. The ALJ did not do this. Instead, he simply stated, within the body of the decision, as follows: "While the claimant alleges disability, in part, due to anxiety and depression, the record shows that absen[t] substance abuse, the claimant has no more than mild restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence or pace." (R. at 16.) From this finding, the court cannot determine whether, under the five-step disability inquiry, the ALJ found McGee's mental impairments were disabling, notwithstanding her substance abuse. For these reasons, the undersigned finds that the ALJ erred by failing to perform the correct substance abuse analysis and recommends that the court remand the case to the ALJ to properly

-10-

perform such analysis with regard to McGee's mental impairments.

McGee also argues that the ALJ erred in his physical residual functional capacity finding. (Plaintiff's Brief at 12-13.) For the following reasons, I disagree. The ALJ found that McGee had the residual functional capacity to lift items weighing up to 45 pounds maximally and up to 25 pounds frequently, that she could sit and/or stand for eight hours in an eight-hour workday with normal positional changes and that her ability to reach above her head was limited by 50 percent, but that she had no limitation with regard to fine motor movement skills. (R. at 17.) I find that this finding is supported by substantial evidence. In particular, I find that this physical residual functional capacity finding is supported by the objective medical evidence of record, including Dr. Blackwell's July 2004 evaluation, as well as by McGee's activities.

The evidence of record shows that McGee was involved in a motor vehicle accident on January 25, 2002. (R. at 230-36.) However, despite McGee's subsequent numerous statements to various healthcare providers that she had fractured a cervical vertebra, x-rays were normal, and she was diagnosed with cervical strain, a right scapular contusion, lumbar strain and lacerations to the scalp and head. (R. at 232, 235-36.) Over the following months, McGee complained of headaches, shoulder pain and neck pain, (R. at 184, 194, 208-14, 216-18, 221-25, 233-34, 567), but physical examinations were essentially normal with the exception of some limited backward extension of the neck, right lateral bends and twists, abduction of the left arm and anterior extension of the left arm. (R. at 194, 567.) McGee was treated conservatively with medications. (R. at 183-84, 194, 567.) X-rays of the cervical spine, taken on

February 6, 2002, showed no deformities except for a loss of the normal lordotic curvature. (R. at 228-29.)

McGee presented to Norton Community Hospital on November 20, 2002, after being involved in another motor vehicle accident. (R. at 204-07.) Despite complaints of right shoulder pain, back pain and bilateral hip pain, x-rays of the cervical spine showed no fracture. (R. at 204, 206-07.) She was diagnosed with cervical strain. (R. at 206.) A week later, McGee was diagnosed with paraspinous muscle strain of the thoracic spine, chronic neck pain and a contusion to the chest after presenting to the emergency department at Norton Community Hospital with complaints of chest and neck pain. (R. at 201-03.) She was treated conservatively with Flexeril. (R. at 203.) On December 2, 2002, a physical examination performed by Dr. R. Michael Moore, M.D., revealed diffuse neck tenderness. (R. at 182.) Dr. Moore diagnosed chronic cervical strain and treated McGee with medications. (R. at 182.) Ten days later, a physical examination revealed essentially normal results with the exception of some slowness in movement of the right upper extremity and shoulder and some tenderness throughout the cervical spine. (R. at 193, 566.) Dr. Gary S. Williams, M.D., noted that McGee's range of motion of the cervical spine had improved. (R. at 193, 566.) McGee was again treated with medications. (R. at 193, 566.)

By January 8, 2003, McGee told Dr. Moore that she had returned to full-time work, sitting eight hours daily. (R. at 178.) She was again diagnosed with chronic cervical strain and prescribed medications. (R. at 178.) On March 3, 2003, McGee complained of tension and migraine headaches. (R. at 177.) After a physical examination revealed diffuse cervical tenderness, Dr. Moore prescribed Lortab. (R.

at 177.)  On June 9, 2003, McGee continued to complain of tension and migraine headaches, and a physical examination again showed diffuse cervical tenderness.  (R. at 175.)  Dr. Moore diagnosed chronic cervical strain and tension headaches and treated McGee with medications.  (R. at 175.)  Later that month, McGee informed Deborah Moore, her caseworker at Frontier Health, and Dr. Randall Pitone, M.D., her psychiatrist, that she planned to enroll in school while working part-time.  (R. at 457.)  On July 17, 2003, McGee reported that she was helping her father in his shop sanding vehicles because she could do it faster than him.  (R. at 434.)  She also stated that she rode a four-wheeler and read to relax.  (R. at 434.)  McGee again stated that she planned to attend college in the fall and would focus on her education before obtaining employment.  (R. at 434.)

On September 9, 2003, McGee again exhibited diffuse neck tenderness and was diagnosed with chronic cervical strain and tension headaches.  (R. at 172.)  She was treated conservatively with medications.  (R. at 172.)  On October 17, 2003, McGee complained of neck pain and back pain after falling on her right hip.  (R. at 171.)  She was diagnosed with chronic cervical strain and chronic back strain and was treated with medications.  (R. at 171.)  On December 9, 2003, McGee's diagnoses and treatment remained unchanged.  (R. at 169.)  On January 21, 2004, she complained of right neck pain after falling over her dog.  (R. at 168.)  Dr. Moore again diagnosed chronic cervical strain and treated McGee with medications.  (R. at 168.)  Later that month, McGee reported taking care of her father and staying busy most of the day.  (R. at 422.)  On February 23, 2004, McGee complained of tension headaches and neck pain.  (R. at 167.)  Physical examination again revealed diffuse neck tenderness, and Dr. Moore treated her conservatively with medications.  (R. at 167.)  On March 8,

2004, McGee informed Dr. Pitone that she had enrolled in college. (R. at 415.) On April 12, 2004, she saw Dr. Moore with complaints of back and neck pain following a domestic dispute. (R. at 559.) Dr. Moore diagnosed an acute cervical strain and prescribed medications. (R. at 559.) On May 24, 2004, McGee's complaints and Dr. Moore's diagnoses remained unchanged. (R. at 558.)

McGee saw Dr. Kevin Blackwell, D.O., for a evaluation of her right shoulder pain and lower back pain on July 30, 2004. (R. at 523-28.) Dr. Blackwell noted that McGee did not appear to be in any acute distress. (R. at 524.) She was fully oriented with good mental status. (R. at 524.) Physical examination revealed a symmetrical and balanced gait. (R. at 525.) Shoulder and iliac crest heights were good and equal bilaterally. (R. at 525.) McGee was tender in the T6 through T12 regions of the thoracic spine. (R. at 525.) She also was tender along the C5 and C7 areas of the neck. (R. at 525.) No spasm or obvious deformities were noted. (R. at 525.) Upper and lower joint examination revealed no effusions or obvious deformities, and the extremities were normal for size, shape, symmetry and strength. (R. at 525.) McGee's grip strength and fine motor movement skills in the hands were good, and her dexterity was intact. (R. at 525.) Reflexes were 2/4 in the upper and lower extremities and equal bilaterally. (R. at 525.) Dr. Blackwell diagnosed McGee with chronic low back/cervical pain, right shoulder pain and hypercholesterolemia by history. (R. at 525.) He opined that McGee could lift items weighing up to 45 pounds maximally and up to 25 pounds frequently. (R. at 525.) Dr. Blackwell further opined that she could sit and/or stand for eight hours in an eight-hour workday, assuming normal positional changes. (R. at 525.) He imposed no limitations on McGee's fine motor movement skills of the hands. (R. at 525-26.) Finally, he found that McGee

should limit overhead reaching activities to less than 50 percent of any given day. (R. at 526.)

X-rays of McGee's lumbar spine taken on July 30, 2004, showed an S1 transitional vertebrae. (R. at 529.) The x-rays were otherwise unremarkable. (R. at 529.) X-rays of the cervical spine showed a reversal of the normal lordotic curvature and mild asymmetry in the space between the odontoid and lateral facets of the C1 vertebra, which could represent changes of rotary fixation. (R. at 531.) X-rays of the right shoulder were normal. (R. at 532.) On August 31, 2004, McGee complained of neck pain and spasm with headaches. (R. at 192, 565.) Physical examination was normal with the exception of very little backward extension of the neck, decreased range of motion of the right side of the neck and tenderness over the right paraspinous cervical muscles. (R. at 192, 565.) Dr. Williams found no focal neurological deficits, and he diagnosed a history of cervical fracture with chronic tension headaches. (R. at 192, 565.) Dr. Williams prescribed Lortab, but stated his preference to discontinue narcotics entirely. (R. at 192, 565.) McGee was referred to Dr. Wright for evaluation of possible Botox injections of the right neck.[5] (R. at 192, 565.) On September 8, 2004, McGee reported that she was looking for employment. (R. at 487.)

On September 30, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that McGee could perform light work.[6] (R. at 533-39.) Dr. Johnson imposed no postural

---

[5]There are no records from Dr. Wright contained in the record on appeal.

[6]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she

-15-

limitations, but he found that McGee was limited in her ability to reach in all directions, including overhead. (R. at 535.) He imposed no visual, communicative or environmental limitations. (R. at 535-36.) Dr. Johnson found that McGee's statements were only partially credible. (R. at 538.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on April 7, 2005. (R. at 538.)

On November 18, 2004, McGee continued to complain of neck pain and headaches. (R. at 191, 564.) Physical examination yielded normal results with the exception of decreased right lateral bend and twist of the neck and a little weakness of the right grip strength. (R. at 191, 564.) No neurologic deficit was noted, and Stacey B. Gipe, a physician's assistant to Dr. Williams, diagnosed chronic neck pain, history of chronic headaches, both tension and migraine, and history of cervical neck fracture. (R. at 191, 564.) Gipe discussed decreasing McGee's Lortab usage, but McGee did not wish to do so. (R. at 191, 564.) McGee was treated with Lortab, Bupap and Remeron. (R. at 191, 564.) On December 8, 2004, McGee reported a potential move for employment purposes. (R. at 486.)

On February 9, 2005, McGee continued to complain of chronic neck pain and headaches. (R. at 190, 563.) Physical examination revealed a "pretty good" range of motion of the neck and upper extremities and good grip strength. (R. at 190, 563.) On March 14, 2005, McGee saw Dr. Williams with continued complaints of neck and shoulder pain. (R. at 562.) Physical examination revealed tenderness and spasm in the posterior neck musculature and, to a milder degree, in the upper back musculature.

---

also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

-16-

Case 2:07-cv-00026-JPJ   Document 26   Filed 10/06/08   Page 16 of 20   Pageid#: 85

(R. at 562.) McGee's range of motion was slightly limited, particularly on rotation to the right, but she exhibited no weakness in the upper extremities. (R. at 562.) Dr. Williams diagnosed cervical disc disease and chronic neck pain and neck spasm. (R. at 562.) He treated her with medications. (R. at 562.) On July 14, 2005, McGee informed Dr. Williams that her pain was controlled with minimal analgesics and one Lortab nightly. (R. at 561.) Dr. Williams noted that McGee's tension headaches, cervical disc disease and cervical trauma with chronic musculoligamentous pain was controlled with Fioricet. (R. at 561.) Physical examination revealed mild to moderate tenderness and spasm in the posterior neck musculature, greater on the right than left, and diffuse pain in the right shoulder area. (R. at 561.) Dr. Williams diagnosed post-traumatic pain of the right shoulder and right neck with chronic pain syndrome and muscle tension headaches, for which he prescribed Lortab. (R. at 561.)

Thus, the evidence of record shows that McGee suffered from relatively mild physical impairments that were treated with no more than conservative treatment. Physical examinations revealed essentially normal findings with some minimal limitations. X-rays were unremarkable. No physician ever suggested that McGee's impairments were severe enough to warrant any type of surgery or corrective procedure. Further, none of the treating medical providers ever placed any restrictions on McGee's activities. The ALJ's physical residual functional capacity finding is further supported by Dr. Blackwell's July 2004 evaluation. While McGee argues that the ALJ should have accorded more weight to the opinions of the state agency physicians, I find that the ALJ properly weighed the evidence. McGee argues that the state agency physicians noted the existence of an MRI dated August 23, 2002, which showed mild degenerative disc disease with a small broad based disc protrusion at the

L5-S1 level of the spine. She notes that this MRI has not been made part of the record, and she further notes the medical expert's testimony that such evidence could have changed her opinion with regard to McGee's limitations. However, this court notes that it is the claimant's responsibility to provide the Commissioner medical evidence showing the existence of an impairment and how severe that impairment is during the time the claimant claims disability. *See* 20 C.F.R. §§ 404.1512, 416.912 (2008). McGee has offered the court no explanation as to why she did not submit these MRI findings to the Commissioner, or this court, for consideration. In addition, while the ALJ has a duty to develop the record, *see Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), the regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2008). I find that the medical evidence is complete enough to make such a determination. Specifically, the evidence submitted to the Commissioner and currently before the court shows that, despite any such MRI findings, for the reasons already stated, McGee's has no more than minimal physical restrictions, and, in addition, the MRI is dated prior to the time that McGee alleges the onset of disability. Finally, the court notes that McGee's own activities support the ALJ's physical residual functional capacity finding. For instance, she informed several health care providers of her intention to enroll in college, and in March 2004, she reported that she had done so. (R. at 415, 434.) The record also shows that McGee either worked for her father or was seeking employment during the time of her alleged disability. (R. at 434, 486-87.) Additionally, she reported that she took care of her father and stayed busy for most of the day, noting that she rode a four-wheeler and read to relax. (R. at 422, 434.) The court finds that the performance

of such activities belies McGee's contention that her physical limitations were more severe than as found by the ALJ.

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's physical residual functional capacity finding, and I recommend that the court affirm the ALJ's decision denying benefits on this ground.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist to support the Commissioner's mental residual functional capacity finding;

2. Substantial evidence does exist to support the Commissioner's physical residual functional capacity finding; and

3. Substantial evidence does not exist to support the Commissioner's finding that McGee was not disabled and was not entitled to benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the Commissioner's and McGee's motions for summary judgment, vacate the decision of the Commissioner denying benefits and remand the case to the Commissioner for additional

consideration pursuant to this decision.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 6th day of October 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE